## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

GARY EDWIN SHARP, II, *et al.*,

CRIMINAL CASE NO.

1:14-CR-00229-TCB-RGV

### MAGISTRATE JUDGE'S REPORT, RECOMMENDATION,
### AND ORDER ON DEFENDANT'S PRETRIAL MOTION

Defendant Gary Edwin Sharp, II ("Sharp"), is charged with conspiracy to infringe copyrights and to circumvent a technological measure that effectively controls access to copyrighted works, in violation of 17 U.S.C. §§ 506(a)(1)(A), 1201(a)(1)(A), and 1204(a). [Doc. 1].[1] Sharp has filed a motion to suppress evidence, [Doc. 54], and following an evidentiary hearing on February 26, 2012,[2] the parties filed post-hearing briefs, [Docs. 61 & 63]. For the reasons that follow, it is

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF, except that citations to the evidentiary hearing transcript are cited according to the transcript page number.

[2] See [Doc. 60] for the transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In addition, the government submitted exhibits at the hearing, which will be referred to as "(Gov. Ex. ___)."

**RECOMMENDED** that Sharp's motion to suppress evidence, [Doc. 54], be

**DENIED**.[3]

## I. STATEMENT OF FACTS

A.      **FBI Agents Interview Sharp**

On the morning of August 21, 2012, Federal Bureau of Investigation ("FBI")

Special Agents Keith Kabrhel ("Agent Kabrhel") and Scott Cieplik ("Agent Cieplik")

went to 5 Old Summit Road, Coventry, Rhode Island, to execute a search warrant

for evidence related to copyright infringement and unauthorized circumvention of

digital access controls.  (Gov. Ex. 2; Tr. at 4–5, 9, 55–56).  Sharp was the subject of the

investigation that led to the search warrant, and the agents believed that Sharp

resided at the Summit Road address.  (Tr. at 6, 38, 56).  When the agents knocked on

the door, they encountered Sharp's father and stepmother, but Sharp was not there.

(Tr. at 5–6, 56).  Sharp's father and stepmother told the agents that Sharp had moved

out of the house and into an apartment about six months earlier, though they did not

know his precise whereabouts.  (Tr. at 6–7, 56).  At some point while the agents were

---

[3] Sharp is also a defendant in another criminal case in which he has filed an identical motion to suppress evidence.  See United States v. Sharp, Criminal Action File No. 1:14-cr-00227-TCB-RGV, at [Doc. 55] (N.D. Ga. Jan. 8, 2015).  The Court will address that motion by way of a separate Report and Recommendation to be filed in that case.

at the house, they learned that Sharp might be living at 129 Quaker Highway,

Apartment 3, Uxbridge, Massachusetts.  (Tr. at 8, 56–57).

That same morning, Agents Kabrhel and Cieplik left the Old Summit Road

residence and drove to the Uxbridge apartment, where they were met by Special

Agents Ott and Luigi.  (Tr. at 8–9, 57–58).[4]  Upon arrival, some of the agents knocked

on the apartment door at around 10:00 a.m.  (Tr. at 9–10, 59–60, 103).  The door was

opened by Sharp's girlfriend, Katherine Renahan ("Renahan"), who at the time lived

with Sharp at the apartment.  (Tr. at 9, 101–03).[5]  Agents Kabrhel and Cieplik

introduced themselves to Renahan and explained that they were looking for Sharp.

(Tr. at 9, 11, 105).[6]  When Renahan told the agents that Sharp was not home, the

agents asked for permission to have a look around the apartment.  (Tr. at 11, 59, 78,

103–05).  Renahan agreed, and the agents briefly looked in each room and confirmed

---

[4] The agents were later joined by another agent, Special Agent Braga, at the Uxbridge apartment.  (Tr. at 58, 72).

[5] Renahan later married Sharp and now shares his last name.  (Tr. at 101). However, for the sake of clarity, she is referred to as Renahan since that was her name when the agents encountered her at the apartment.

[6] Agents Kabrhel and Cieplik were casually dressed, likely wearing polo shirts and cargo pants, and although each carried a firearm on their side, it was generally covered by their clothing.  (Tr. at 10, 22, 60–61).

that no one else was there.  (Tr. at 11, 59–60, 73–74, 78, 105, 109).[7]  Renahan called

Sharp on the telephone and then handed the phone to Agent Kabrhel, who told

Sharp that the agents "had some questions for him" that they thought he might be

able to answer.  (Tr. at 12, 42, 59, 60, 63, 104–05).[8]  Sharp replied that he was at work

and would be there in about half an hour.  (Tr. at 12, 60).

The agents waited for Sharp at the apartment,[9] and when Sharp arrived about

half an hour later, Agent Kabrhel got up to greet him, shook his hand, and explained

that the agents would like to talk to him.  (Tr. at 13, 17, 63, 117).  Agent Kabrhel also

told Sharp that he was not under arrest and that "anything he said to [them] or

---

[7] Agent Kabrhel testified that Renahan invited the agents into the apartment after they introduced themselves, (Tr. at 11, 15, 41), while Renahan testified that the agents first asked if they could come inside and wait for Sharp to come home, (Tr. at 103-04, 113).  By the time the agents looked through the apartment, Agents Kabrhel, Cieplik, Ott, and Luigi were all inside.  (Tr. at 59–60).

[8] Renahan testified that she "believe[d]" that Sharp was told over the phone that he "needed to come home," (Tr. at 105), though Agent Kabrhel expressly denied telling Sharp that he "needed to come home" or "had" to come back, and instead testified that he merely "requested" that Sharp return to the apartment, (Tr. at 12–13, 43).  Renahan testified that, before the agents arrived at the apartment, she had received a call from Sharp's father, who alerted her that agents were coming to the apartment, and before the agents arrived, she called Sharp and told him that "he needed to come home."  (Tr. at 102-03).

[9] Agent Kabrhel testified that after he got off the phone with Sharp, he asked Renahan if she would like the agents to wait outside for Sharp to return, and that Renahan answered, "No," and said that the agents could wait inside and have a seat on the couch, which the agents did.  (Tr. at 15).

whether or not he talked to [them] was voluntary." (Tr. at 17, 65); see also (Tr. at 47 ("[I]t was when [Sharp] was home before he started talking to us that I explained to him that him talking to us was voluntary, and by that I meant that he didn't have to answer our questions."), 54).[10] Sharp agreed to speak with the agents, and Agents Kabrhel and Cieplik accompanied Sharp into another room in the apartment to interview him. (Tr. at 17–19, 63, 118, 126).[11] Agent Kabrhel led the conversation while Agent Cieplik took notes, (Tr. at 64), and the interview eventually concluded after about an hour when Agent Kabrhel ran out of questions to ask, (Tr. at 19, 23, 36, 48, 69, 106, 118).[12] Sharp testified that Agents Kabrhel and Cieplik were both "very friendly" during the interview. (Tr. at 120, 127).

---

[10] At the evidentiary hearing, Sharp denied that the agents ever told him that he did not have to talk to them, (Tr. at 118), while Agent Cieplik testified that the agents advised him that he "didn't have to" speak with them, (Tr. at 63).

[11] Specifically, Agent Kabrhel asked Sharp if he would be willing to talk with the agents in a separate room away from Renahan, and Sharp agreed to do so. (Tr. at 17, 63). Sharp also testified that he "wanted to talk to [the agents] in the living room, but they [] insisted to go somewhere . . . private." (Tr. at 118, 126). However, Renahan averred that she did not hear Sharp say anything about where he wanted the interview to take place. (Tr. at 106). Similarly, Agent Cieplik did not recall that Sharp wanted to remain with Renahan or stay in the living room while he spoke with the agents. (Tr. at 74).

[12] Sharp testified that he "recall[ed]" that one of the agents had closed the door during the interview, (Tr. at 119), but both Agent Kabrhel and Agent Cieplik testified that the door to the room remained partially open, (Tr. at 19, 64).

**B.**     <u>Sharp Consents to the Search of his Computer and Online Accounts</u>

Toward the end of the interview, Agent Kabrhel asked for Sharp's consent to access certain of Sharp's online accounts and to search any computers or electronic media for evidence relating to the agents' investigation.  (Tr. at 24, 30, 49, 121-22).  The parties dispute what happened next.  According to Sharp, he told the agents "more than once" that he did not want to give them his computer (a Toshiba laptop), (Tr. at 120–23); <u>see also</u> (Tr. at 108, 110 (Renahan indicating that she overheard Sharp say he did not want to give the agents his computer)), but the agents nonetheless persisted in seeking his consent, (Tr. at 148–49 (Sharp alleging that the agents asked for consent to search his computer "probably about three times")).  Agent Kabrhel and Agent Cieplik, on the other hand, both testified that they had no recollection that Sharp ever expressed any reluctance to consent to the search of his computer or that Sharp was ever asked to consent more than once.  (Tr. at 50, 76–77).  Sharp further alleges that Agent Kabrhel told him that he "needed" Sharp's computer and mentioned "something about a search warrant," after which Sharp "reluctantly [] finally agreed" to turn the computer over, (Tr. at 122–23); <u>see also</u> (Tr. at 108, 111 (Renahan affirming that she heard the agents tell Sharp that "they could just get a search warrant and they could just wait for it"), 145-46 (Sharp indicating that Agent Kabrhel said something to the effect that the agents would get a search warrant for

the computer if Sharp did not consent)).  Conversely, neither Agent Kabrhel nor Agent Cieplik recalled telling Sharp that the agents could get a search warrant for any of the items in Sharp's apartment.  (Tr. at 50-51, 77).

Following the interview, Agent Kabrhel presented Sharp with a standard FBI "Consent to Search Computer(s)" form ("computer consent form"), (Gov. Ex. 4; Tr. at 30-31), and a standard FBI "Consent to Assume Online Identity Authorization Form" ("account consent form"), (Gov. Ex. 3; Tr. at 24–25).  Agent Kabrhel separately read each of the consent forms aloud to Sharp while holding the forms in front of him so he could read along.  (Tr. at 25–26, 31, 68, 130).  Sharp also read the forms for himself, (Tr. at 128, 130), and then signed each form, (Tr. at 28, 32–33, 67–69, 128–30).  Sharp did not indicate to the agents that he refused to sign either form.  (Tr. at 128, 130).

By signing the computer consent form, Sharp agreed to allow the agents to search his Toshiba laptop computer and two disks.  See (Gov. Ex. 4).  By signing the account consent form, Sharp authorized the agents to assume his online identity for his accounts with Gmail, Dropbox, and Facebook.  See (Gov. Ex. 3; Tr. at 27–28).  On a separate page, Sharp also wrote down instructions on how to access his online accounts.  (Gov. Ex. 3; Tr. at 29, 128–29).  Sharp also expressly acknowledged on each of the consent forms that he had been advised of his right to refuse consent, and that

he gave his consent freely and voluntarily, without threats or promises of any kind. <u>See</u> (Gov. Ex. 3 ("I give this consent freely and voluntarily, without fear, threats, coercion, or promises of any kind.  I have been advised of my right to refuse to allow the FBI to assume my (or my child's) online identity, and I hereby voluntarily waive this right."); Gov. Ex. 4 ("I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind.")).

## C.    **Sharp's Revocation of Consent**

The agents then left the apartment with Sharp's computer and disks, (Tr. at 34–35),[13] which were delivered to the office of FBI Special Agent Kevin Orkin ("Agent Orkin") in Atlanta on August 31, 2012, (Gov. Ex. 5; Tr. at 82–83).  Agent Orkin accessed Sharp's Gmail and Facebook accounts on August 23, 2012, and he accessed Sharp's Dropbox account on August 27, 2012.  (Tr. at 79–80).  On August 24, 2012, Sharp e-mailed Goldstein to inquire about recovering the use of his online accounts.   (Gov. Ex. 8); <u>see also</u> (Tr. at 124 (Sharp affirming that he advised Goldstein that he "wanted to take back [his] consent to search")).  On August 27, 2012, at 4:36 p.m., Assistant United States Attorney Brian Pearce ("Pearce") sent an

---

[13] After the agents left the apartment, Sharp called the Electronic Frontier Foundation, through which he was eventually put in touch with an attorney by the name of Robert Goldstein ("Goldstein").  (Tr. at 124, 132-35, 147).

e-mail to Goldstein stating, "I'm on the line with the case agent now and have told him to stop all searches on the three accounts due to revocation you just communicated." (Gov. Ex. 1); see also (Tr. at 136–37).[14]

Upon receipt of the evidence taken from Sharp's apartment, Agent Orkin also asked FBI Special Agent Steven Bennett ("Agent Bennett") to make a forensic copy or image of Sharp's computer, adding that Agent Bennett should do so "as soon as possible" since the computer was obtained based on Sharp's consent. (Tr. at 84, 92-93). Agent Bennett accepted custody of the computer on September 7, 2012, (Gov. Ex. 5; Tr. at 84, 93); he began imaging the laptop at around 4:00 or 5:00 p.m. on September 10, 2012, (Tr. at 94); and on September 11, 2012, at 8:45 a.m., he learned that the imaging process had been completed, (Gov. Ex. 7; Tr. at 95–98).[15] On September 11, 2012, at 3:44 p.m., Goldstein sent an e-mail to Pearce indicating that Sharp had revoked his consent to the search and seizure of his property, including his computer, (Gov. Ex. 1), and Agent Orkin learned that Sharp had revoked his consent to the search of the computer at 4:24 p.m. that same day, (id.; Tr. at 85-86).

_____

[14] Agent Orkin was the "case agent" to whom Pearce communicated Sharp's revocation of consent to search the online accounts. See (Gov. Ex. 1; Tr. at 81–82). Agent Orkin also testified that to the extent he had searched Sharp's online accounts, the search would have been of the account contents which he had downloaded to an FBI computer from the online servers that stored it. (Tr. at 87, 90).

[15] After the information on Sharp's computer was imaged onto a separate hard drive, the imaged hard drive was transferred into evidence. (Tr. at 98).

Agent Orkin testified that any search of Sharp's computer would have been a search of the forensic copy of the computer only.  (Tr. at 90 ("We always search an image, a forensic image, to preserve the original evidence.  So we always work off the image.")).

**D.**   **Search Warrants for Sharp's Facebook Accounts and Computer**

On February 8, 2012, the FBI obtained a search warrant for several of Sharp's Facebook accounts that were connected in some way to "Applanet" and "SnappzMarket," which were allegedly involved in the illegal distribution of copyrighted works.  [Doc. 54-1].  On November 16, 2012, the FBI obtained a search warrant for Sharp's Toshiba laptop computer.  [Doc. 54-3].

## II.  DISCUSSION

Sharp moves to suppress any evidence derived from his online accounts and his laptop computer.  [Docs. 54 & 61].  In support of this motion, Sharp argues: (1) that his consent to search was not voluntary; (2) that any searches occurring after the revocation of his consent were illegal; (3) that the affidavit in support of the laptop search warrant contains knowing and material misrepresentations and omissions; and (4) that the Facebook search warrant lacks probable cause and fails to satisfy the particularity requirement.  [Id.].  The Court will consider each of Sharp's arguments in turn.

### A.    Sharp's Consent Was Voluntary

Sharp argues that his consent to the search and seizure of his laptop and online accounts was merely an acquiescence to a show of lawful authority and was therefore coerced and involuntary.  [Doc. 54 at 7–8; Doc. 61 at 4–5].  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  To that end, "a search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location."  United States v. Cruz, Criminal Action No. 1:11–CR–0377–WSD–CCH, 2012 WL 1564671, at *5 (N.D. Ga. Mar. 19, 2012), adopted by 2012 WL 1564667, at *3 (N.D. Ga. Apr. 30, 2012) (citing Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619 (1989); Mincey v. Arizona, 437 U.S. 385, 390 (1978)).  Warrantless "searches and seizures inside a home . . . are presumptively unreasonable," United States v. Bervaldi, 226 F.3d 1256, 1262-63 (11th Cir. 2000) (citing Payton v. New York, 445 U.S. 573, 586, 603 (1980)), subject only to "a few specifically established and well-delineated exceptions," Mincey, 437 U.S. at 390 (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).  "[E]vidence is inadmissible if it is obtained through a search and seizure that is conducted without a warrant and is not subject to one of the specific exceptions to

the warrant requirement." Cruz, 2012 WL 1564671, at *5 (citing Mapp v. Ohio, 367 U.S. 643, 655 (1961)).  Since a warrantless search or seizure is presumptively invalid, the government bears the burden of establishing by a preponderance of the evidence that a particular exception to the warrant requirement applies.  Michigan v. Tyler, 436 U.S. 499, 509 (1978); Vale v. Louisiana, 399 U.S. 30, 34 (1970).

"One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989) (citations omitted).  See also Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Reynolds, 526 F. Supp. 2d 1330, 1336 (N.D. Ga. 2007).  "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice."  Garcia, 890 F.2d at 360 (citation omitted).  The government bears the burden of proving that consent was voluntary, United States v. Tovar-Rico, 61 F.3d 1529, 1536 (11th Cir. 1995), and voluntariness of consent is determined on the basis of the totality of the circumstances, Schneckloth, 412 U.S. at 227; Reynolds, 526 F. Supp. 2d at 1337.  Relevant factors include whether the consenting party was free to leave or refuse consent, the existence of coercive police procedures, the extent of the consenting party's cooperation or awareness of a right to refuse consent, the consenting party's education and intelligence, and the consenting party's belief that

no incriminating evidence would be found.  <u>United States v. Ramirez-Chilel</u>, 289

F.3d 744, 752 (11th Cir. 2002); <u>United States v. Purcell</u>, 236 F.3d 1274, 1281 (11th Cir.

2001).

After careful consideration of the testimony and evidence presented at the

evidentiary hearing in this case, the Court finds that Sharp voluntarily consented to

the search of his laptop computer and online accounts.  During their time at the

apartment, the agents never told Sharp he was not free to leave or tried to stop him

from leaving, (Tr. at 23, 112, 132), and at no point was Sharp in custody or under

arrest, (Tr. at 21, 22–23, 67).  On the contrary, Agent Kabrhel explicitly told Sharp

that he was not under arrest and that "anything he said to [the agents] or whether

or not he talked to [them] was voluntary."  (Tr. at 17, 65).  The agents never

handcuffed Sharp or physically restrained him in any way, nor did they draw or

display their weapons.  (Tr. at 15–16, 21–22, 61–62, 66–67, 110, 112, 126–27, 131–32).

Sharp did not tell the agents that he would not talk to them or ask to discontinue

their conversation, and he did not tell the agents to leave at any time.  (Tr. at 21, 111,

126, 132).  During the interview, Sharp's path to the door was unobstructed and he

did not ask for a break or say that he wanted to leave.  (Tr. at 19–21, 64–65).  The tone

of Sharp's conversation with the agents was calm and non-confrontational.  (Tr. at

19, 46, 66).  Neither Sharp nor the agents spoke with a raised voice, (Tr. at 20, 23, 66,

111), and Sharp testified that Agents Kabrhel and Cieplik were in fact "very friendly" during the interview, which took place in the familiar surroundings of Sharp's own home, (Tr. at 120, 127). Sharp did not appear to be confused or impaired, and he gave appropriate, direct, and open answers to the agents' questions. (Tr. at 19, 36, 66, 69). Finally, it is undisputed that Agent Kabrhel separately read each of the consent forms aloud to Sharp while holding the forms in front of him, (Tr. at 25–26, 31, 68, 130); that Sharp did not refuse to sign either form, (Tr. at 128, 130); and that Sharp also signed the forms after reading them for himself, (Tr. at 28, 32–33, 67–69, 128–30).

Although Sharp testified that the agents did not "say [he] could refuse" when they asked him about searching his laptop and emails, (Tr. at 125), Sharp unequivocally acknowledged, by signing each of the consent forms, that he had been advised of his right to refuse consent, see (Gov. Exs. 3 & 4). Moreover, even if the agents did not, as Sharp contends, expressly advise Sharp of his right to refuse consent, the mere failure of law enforcement to inform the consenting party of the right to refuse consent does not render the consent involuntary in the absence of coercive police behavior. See United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999) (quoting Ohio v. Robinette, 519 U.S. 33, 39 (1996); Florida v. Royer, 460 U.S. 491, 497 (1983)) ("While the government's burden of proving the voluntariness of

consent is not satisfied by 'showing a mere submission to a claim of lawful authority,' the government need not establish [the consenting party's] knowledge of the right to refuse consent 'as the *sine qua non* of an effective consent.'").

As previously mentioned, the record includes contrasting accounts of whether the agents had to ask Sharp for his consent more than once or whether they told him they could get a search warrant if he did not consent.[16]   The Court need not resolve these discrepancies, however, since even if Sharp's version of events is credited, his consent was nonetheless voluntary under the totality of the circumstances.  See Garcia, 890 F.2d at 361 (consent to search held voluntary where agents asked for consent more than once and also mentioned obtaining a search warrant, but never represented that they were actually "in possession of a search warrant, or that they could lawfully search . . . without [] consent").  Indeed, consent has been found voluntary in circumstances far more coercive than those presented here, especially since Sharp was not under arrest or threatened with arrest when he consented to the search.  See, e.g., United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir. 1993) (consent held voluntary where the defendant had been "arrested by SWAT team members

---

[16] Sharp testified that he "felt threatened" by the alleged reference to a search warrant, but he admits that the agents did not otherwise make any actual threats, and there is no indication that the agents engaged in coercive behavior of any sort. (Tr. at 131).  In fact, by signing the consent forms, Sharp agreed that his consent was given freely and voluntarily, and not as the result of "threats" of any kind.  (Gov. Exs. 3 & 4).

who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint"); Garcia, 890 F.2d at 361 (consent was voluntary despite officers' refusal to accept suspect's conditional consent to search as well as threats to obtain a search warrant if the suspect did not consent to a full search); United States v. Long, 866 F.2d 402, 404 (11th Cir. 1989) (holding consent voluntary where officers said they would return and "dig the place up" if consent were refused); United States v. Espinosa-Orlando, 704 F.2d 507, 513 (11th Cir. 1983) (consent found voluntary where individual was arrested at gunpoint, forced to lie on the ground, and consented while one officer had his weapon drawn).  See also United States v. Scott, 517 F. App'x 647, 650 (11th Cir. 2013) (per curiam) (unpublished) (although defendant initially refused consent to a search of his home and eventually consented only while handcuffed and under arrest, consent was voluntary because it was "not obtained by coercive or deceptive [police] conduct"); United States v. Barsoum, No. 8:11-cr-548-T-33MAP, 2012 WL 1405699, at *1, 3 (M.D. Fla. Apr. 5, 2012), adopted by 2012 WL 1405679, at *1 (M.D. Fla. Apr. 23, 2012), aff'd, 763 F.3d 1321 (11th Cir. 2014) (finding that defendant "freely consented" to the search of his home, where agents pounded on his front door at 6:00 a.m., pulled him out of his house and handcuffed and shackled him, and then conducted an unlawful sweep of his residence with his family inside, all the while with their weapons drawn and under "[c]ircumstances

[that] were purposely intimidating"). <u>Cf.</u> <u>Tovar-Rico</u>, 61 F.3d at 1536 (consent to search was involuntary where it was given only after the consenting party "had already observed officers explore every room in the apartment and could not reasonably have known that she could still refuse a search").

Under the totality of the facts and circumstances in this case, the Court finds that Sharp knowingly and voluntarily consented to the search of his laptop and online accounts, and that his consent was therefore "the product of an essentially free and unconstrained choice."  <u>See</u> <u>Garcia</u>, 890 F.2d at 360.  Accordingly, the evidence in this case is not due to be suppressed on the basis that Sharp's consent to search was invalid.

**B.    <u>Sharp Revoked Consent only after the Relevant Evidence was Imaged</u>**

Sharp argues that any information the agents learned from his online accounts after 4:36 p.m. on August 27, 2012, should be suppressed, "even if they were only searching a copy of the information in the three accounts," as the revocation of Sharp's consent to search the accounts was communicated to Agent Orkin at that time.  [Doc. 61 at 5].  Along the same lines, Sharp maintains that any search of the image of his laptop computer which occurred after he revoked his consent was "non-consensual and illegal" and should therefore be excluded from evidence.  [<u>Id.</u> at 6].  The record in this case demonstrates that the FBI completed the imaging of

Sharp's laptop and online accounts before Sharp revoked his consent, and that any post-revocation searches (with the exception of any searches that may have been conducted following the issuance of the warrants for the laptop and Facebook accounts) were only searches of the imaged copies of the laptop and accounts, and not direct searches of the laptop and accounts themselves. See (Gov. Exs. 1 & 8; Tr. at 79–80, 87, 90, 124, 136–37 (evidence that Agent Orkin downloaded copies of the information stored on Sharp's online accounts on August 23 and August 27 of 2012—before Sharp revoked his consent to the search of the accounts at 4:36 p.m. on August 27, 2012—and that any subsequent searches were of the imaged copies of the accounts only), Gov. Exs. 1 & 7; Tr. at 90, 94–98 (evidence that Agent Bennett completed imaging Sharp's laptop by 8:45 a.m. on September 11, 2012, but that Sharp did not revoke consent to the search of his laptop until 3:44 p.m. that same day, and that later searches of the laptop were searches of the image only).

Sharp has cited to no authority, nor has the Court found any, suggesting that the continued review of a copy of evidence that was initially obtained pursuant to a valid consent to search is prohibited by a later revocation of the consent to search the evidence itself, when the copy was made during the period in which the consent was still in effect. To the contrary, a "valid consent to a search . . . carries with it the ri[g]ht to examine and []copy," United States v. Ponder, 444 F.2d 816, 818 (5th Cir.

18

1971)[17] (citations omitted), and the revocation of such consent "does not affect the validity" of searches occurring before the revocation was made, see Mason v. Pulliam, 557 F.2d 426, 429 (5th Cir. 1977). See also United States v. Ward, 576 F.2d 243, 244-45 (9th Cir. 1978) ("Because the records were given to the IRS on March 26, 1975, and the demand for return was not made until March 31, 1975, we agree with the district court that any evidence gathered or copies made from the records during the intervening five days should not be suppressed."); United States v. Megahed, No. 8:07-CV-342-T23MAP, 2009 WL 722481, at *3 (M.D. Fla. Mar. 18, 2009) (footnote and citations omitted) (where agents made a "mirror image copy" of the hard drive of a computer that was seized pursuant to valid consent, later revocation of that consent "did not operate retroactively to nullify" the agents' right to search the copied information). In other words, the only searches of Sharp's online accounts and laptop that were made based on Sharp's consent were also made while Sharp's consent still remained in effect, and Sharp's later revocation of that consent does not provide a basis for the exclusion of evidence obtained from the pre-revocation searches or from any post-revocation review of information that was copied prior to revocation.

---

[17] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

C.     **The Laptop Search Warrant is Supported by Probable Cause and Does Not Contain Knowing and Material Misrepresentations**

Sharp argues that the search warrant affidavit for his Toshiba laptop relies on information which FBI agents illegally obtained by searching the image of his laptop during the time after his consent to search the laptop had been revoked, but before the warrant had been issued.  [Doc. 61 at 6–7].  Yet, while this affidavit does reference information learned in October of 2012—after Sharp had revoked his consent to search his laptop the previous month—it also clearly acknowledges that Sharp eventually revoked his consent to search the laptop, and that the search in October was "a search of the imaged hard drive" of the laptop, rather than of the laptop itself.  [Doc. 54-3 at 13 ¶¶ 30–32, 14 ¶ 33].  The affidavit also states that Sharp gave written consent to the search of his laptop on August 21, 2012, [id. at 12–13 ¶¶ 26–27], and that the imaging process was completed by 8:45 a.m. on September 11, 2012, [id. at 13 ¶ 29], which, as discussed above, was before the time of revocation.  Thus, the search warrant affidavit for the laptop did not rely on any illegally obtained evidence, and Sharp's argument in this regard is without merit.

Sharp's argument in this respect also fails because, even if the evidence obtained through the search of the image of the laptop in October, 2012, is excised from the affidavit, the affidavit includes sufficient additional information to provide an independent basis for probable cause that evidence of a crime would be found

on Sharp's computer.  See United States v. Umole, 162 F. App'x 948, 950 (11th Cir.

2006) (per curiam) (unpublished) (explaining that the defendant bears the burden

of  showing that probable cause would have been lacking in the absence of the

alleged misrepresentations or omissions); United States v. Nakouzi, No.

3:05CR154(MRK), 2005 WL 3211208, at *5 (D. Conn. Nov. 30, 2005) ("[I]f the court

is satisfied that when material that is the subject of the alleged falsity or reckless

disregard is set to one side, there remains sufficient content in the warrant affidavit

to support a finding of probable cause, then no hearing is required.").  For instance,

the affidavit indicates that Applanet was "actively sharing copyrighted works for

free" while SnappzMarket allowed users to "download Android [apps] without

paying the fee associated with these same apps on the Android Marketplace," [Doc.

54-3 at 10 ¶¶ 11, 15]; that Sharp told FBI agents that he had previously worked for

Applanet and that he helped form SnappzMarket as an alternative market, [id. at 12

¶ 22]; and that Sharp also admitted that he had uploaded copyrighted apps onto the

SnappzMarket website, [id. at 12 ¶ 24], and that the Toshiba laptop belonged to him

and that he used it for SnappzMarket business, [id. at 12 ¶ 26].  The affidavit thus

establishes probable cause to search the Toshiba laptop even when the

representations concerning the review of the imaged laptop in October of 2012 are

not taken into consideration.  See United States v. Miller, 24 F.3d 1357, 1361 (11th

Cir. 1994) (citations omitted) (noting that probable cause requires only a "fair probability" that "an offense has been committed and that evidence exists at the place for which the warrant is requested.").

Sharp further contends that the affidavit contains knowing and material misrepresentations and omissions in that it fails to specify the date on which Sharp revoked his consent or that the revocation occurred before the agents searched the image of the computer in October, 2012. See [Doc. 54 at 8–9; Doc. 61 at 6–7]. Any such misrepresentations or omissions cannot be material, however, since, as already discussed, the affidavit clearly states that the October, 2012, search was a search of the image of the laptop, which was valid regardless of Sharp's earlier revocation, inasmuch as the laptop itself was only searched and imaged, based on Sharp's original consent while that consent was still in effect. See United States v. Maharaj, No. 07-80024-CR-CR, 2007 WL 2254559, at *6 (S.D. Fla. Aug. 2, 2007), adopted at *1 (quoting United States v. Ofshe, 817 F.2d 1508, 1513 (11th Cir. 1987)) (noting that "'[i]nsignificant and immaterial misrepresentations or omissions will not invalidate a warrant'"). Accordingly, the search warrant affidavit for Sharp's laptop is supported by probable cause and does not include any knowing and material misrepresentations or omissions, and Sharp's motion to suppress evidence obtained pursuant to that warrant is therefore due to be denied.

**D.**   **The Facebook Search Warrant is Supported by Probable Cause**

Sharp argues that the Facebook search warrant lacks probable cause because it does not include sufficient information to connect Sharp's Facebook accounts to evidence of a crime.  See [Doc. 54 at 5–6].  "In attempting to ensure that search warrant affidavits comply with the Fourth Amendment's prohibition against unreasonable searches and seizures resultant from warrants issued without probable cause, the issuing magistrate 'is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability" that "an offense has been committed and that evidence exists at the place for which the warrant is requested."  Miller, 24 F.3d at 1361 (citations omitted).  "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations."  Id.  Furthermore, "[t]he fact than an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."  United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985).

Notwithstanding Sharp's objections to the contrary, the affidavit for the Facebook search warrant provides detailed information establishing a fair

probability that evidence of copyright infringement would be found in Sharp's Facebook accounts.  Among other things, the affidavit recounts facts establishing that Applanet and SnappzMarket were infringing and distributing copies of copyrighted works; that Sharp was listed as the "'page owner'" of the Applanet Facebook page and the Applanet Facebook page in turn linked to Sharp's Facebook page; that Sharp was also a page owner of the SnappzMarket Facebook page, which was linked to another of Sharp's Facebook pages; and that the co-owner of the SnappzMarket Facebook page informed an undercover agent that Sharp had helped him develop SnappzMarket.  <u>See</u> [Doc. 54-1 at 10–14 ¶¶ 9–29].  In this way, "the affidavit . . . establish[ed] a connection between [Sharp] and the [Facebook accounts] to be searched and a link between the [Facebook accounts] and . . . criminal activity."  <u>See</u> <u>United States v. Williams</u>, No. 6:08-cr-190-Orl-22GJK, 2008 WL 5398032, at *7 (M.D. Fla. Dec. 24, 2008), adopted at *4 (citation and internal marks omitted).  Viewed as a whole and under a common-sense approach, the affidavit thus plainly gives rise to a fair probability that Applanet and SnappzMarket were engaged in copyright infringement, and that a search of Sharp's Facebook accounts would reveal evidence relating to that crime.[18]

---

[18] Furthermore, as the government points out, [Doc. 63 at 28–29], even if the Facebook warrant were not supported by probable cause, any evidence obtained pursuant to the warrant was based upon a reasonable reliance on the warrant's validity, and would therefore not be subject to the exclusionary rule.  <u>See</u> <u>United</u>

Sharp next contends that the Facebook search warrant fails to satisfy the Fourth Amendment's particularity requirement because it "required Facebook to disclose the entire cache of information" related to the relevant Facebook accounts, and did not include any limitations based on time, subject matter, or other criteria. See [Doc. 54 at 6]. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. See also Fed. R. Crim P. 41. "The 'manifest purpose' of the 'particularity requirement of the Fourth Amendment' is 'to prevent general searches.'" United States v. Ellis, 971 F.2d 701, 703 (11th Cir. 1992) (quoting Leon, 468 U.S. at 963 (Stevens, J., concurring)). "A general order to explore and rummage through a person's belongings is not permitted." United States v. Cook, 657 F.2d 730, 733 (5th Cir. Unit A 1981). "The fact that [a] warrant call[s] for seizure of a

_____

States v. Leon, 468 U.S. 897, 926 (1984); United States v. Martin, 297 F.3d 1308, 1313–17 (11th Cir. 2002) (good faith exception applied where "the affidavit contained sufficient indicia of probable cause to enable a reasonable officer to execute the warrant thinking it valid" and where the issuing judge "did not cross the line and wholly abandon his judicial role"); United States v. Taxacher, 902 F.2d 867, 871-72 (11th Cir. 1990) (explaining the limited circumstances in which the Leon good faith exception does not apply); United States v. Maxwell, 920 F.2d 1028, 1034 (D.C. Cir. 1990) (citing Leon, 468 U.S. at 920-21 & Massachusetts v. Sheppard, 468 U.S. 981, 987-88 (1984)) (noting that under Leon, "the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate").

25

broad array of items does not, in and of itself, prove that the warrant fails to meet this requirement of particularity." United States v. Sugar, 606 F. Supp. 1134, 1151 (S.D.N.Y. 1985). See also United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents, 307 F.3d 137, 149 (3d Cir. 2002) ("Although the scope of the warrant was certainly extensive, the warrant was not general."). "The warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." Cook, 657 F.2d at 733. See also Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).

The Facebook search warrant was not a general warrant because it described with sufficient particularity not only the information to be disclosed from the Facebook accounts, but also the specific evidence which the government was allowed to seize from within that body of information. See [Doc. 54-1 at 22–23 ¶ 77, 25–26]. Under Federal Rule of Criminal Procedure 41(e)(2)(B), a warrant "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information," and "[u]nless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant." Fed. R. Crim. P. 41(e)(2)(B). Because the Facebook search warrant authorized the searching agents to review the information obtained from Sharp's Facebook accounts for evidence relevant to copyright infringement and unauthorized

circumvention of digital access controls, see [Doc. 54-1 at 26], it did not allow a "general, exploratory rummaging" in violation of the Fourth Amendment's particularity requirement, see Maharaj, 2007 WL 2254559, at *11 (quoting United States v. Wuagneux, 683 F.2d 1343, 1348-49 (11th Cir. 1982)).

Indeed, as the government correctly observes, [Doc. 63 at 29–30], federal courts around the country have upheld similar search warrants that seek to obtain information from e-mail accounts, and the Court agrees that the principles supporting these courts' decisions are equally applicable where the search warrant seeks information in the context of Facebook accounts.  See Matter of Search of Info. Associated with [redacted]@mac.com that is Stored at Premises Controlled by Apple, Inc., 13 F. Supp. 3d 157, 165–66 (D.D.C. 2014); United States v. Lustyik, No. 2:12-CR-645-TC, 2014 WL 1494019, at *7 (D. Utah Apr. 16, 2014) (citations omitted) (language in warrants which limited the evidence investigators could seize "was more than sufficient to limit the scope of the warrants, and prevent[ed] the warrants from being generalized warrants"); United States v. Deppish, 994 F. Supp. 2d 1211, 1219–20 (D. Kan. 2014); United States v. Taylor, 764 F. Supp. 2d 230, 237 (D. Me. 2011) (footnote omitted) ("The Fourth Amendment does not require the government to delegate a prescreening function to the internet service provider or to ascertain which [pieces of online information] are relevant before copies are obtained from the

internet service provider for subsequent searching."); see also Andresen v. Maryland, 427 U.S. 463, 482 (1976) (noting that, even "[i]n searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized").  Accordingly, the Facebook search warrant is supported by probable cause and satisfies the Fourth Amendment's particularity requirement, and Sharp's motion to suppress the evidence derived from that source is without merit and is due to be denied.

## III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Sharp's motion to suppress evidence, [Doc. 54], be **DENIED**.   There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial as to all defendants.

**IT IS SO ORDERED AND RECOMMENDED**, this 12th day of June, 2015.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

28