IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GARY EDWIN SHARP, II, et al.,<br><br>Defendants. | CIVIL ACTION FILE<br><br>NUMBER 1:14-cr-229-TCB |

# **O R D E R**

This case comes before the Court on Magistrate Judge Vineyard's Final Report and Recommendation (the "R&R") [71], which recommends denying Defendant Gary Edwin Sharp, II's motion to suppress [54]. Sharp has filed objections to the R&R [74].

## I.    Legal Standard on Review of a Magistrate Judge's R&R

A district judge has a duty to conduct a "careful and complete" review of a magistrate judge's R&R. *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam) (quoting *Nettles v. Wainwright*,

677 F.2d 404, 408 (5th Cir. Unit B 1982)).[1] Where a party objects to an R&R, a district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The district judge must "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512 (11th Cir. 1990). Those portions of the R&R to which no objection is made need only be reviewed for clear error. *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).[2]

---

[1] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981, as well as all decisions issued after that date by the Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982); *see also United States v. Schultz*, 565 F.3d 1353, 1361 n.4 (11th Cir. 2009) (discussing continuing validity of *Nettles*).

[2] *Macort* addressed only the standard of review applied to a magistrate judge's factual findings, but the Supreme Court has held that there is no reason for a district court to apply a different standard of review to a magistrate judge's legal conclusions. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Thus, district courts in this circuit have routinely applied a clear-error standard to both. *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1373-74 (N.D. Ga. 2006) (collecting cases). By contrast, the standard of review on appeal distinguishes between factual findings and legal conclusions. *See Monroe v. Thigpen*, 932 F.2d 1437, 1440 (11th Cir. 1991) (when magistrate judge's findings of fact are adopted by district court without objection, they are reviewed on appeal under plain-error standard, but questions of law remain subject to de novo review).

"Parties filing objections must specifically identify those findings objected to. Frivolous, conclusive or general objections need not be considered by the district court." *Nettles*, 677 F.2d at 410 n.8. "This rule facilitates the opportunity for district judges to spend more time on matters actually contested and produces a result compatible with the purposes of the Magistrates Act." *Id.* at 410.

After conducting a complete and careful review of the R&R, the district judge may accept, reject or modify the magistrate judge's findings and recommendations. 28 U.S.C. § 636(b)(1)(C); *Williams*, 681 F.2d at 732. The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1)(C). The district judge also has discretion to decline to consider arguments that were not raised before the magistrate judge. *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009). Indeed, a contrary rule "would effectively nullify the magistrate judge's consideration of the matter and would not help to relieve the workload of the district court." *Id.* (quoting *United States v. Howell*, 231 F.3d 615, 622 (9th Cir. 2000)).

## II.   Factual Background

The magistrate judge discussed the facts thoroughly, and the Court will briefly restate only those most relevant to its ruling. On the morning of August 21, 2012, Federal Bureau of Investigation Agents Keith Kabrhel and Scott Cieplik went to 5 Old Summit Road, Coventry, Rhode Island, to execute a search warrant for evidence related to copyright infringement and unauthorized circumvention of digital access codes. Sharp was the subject of the investigation, and the agents believed that Sharp resided at the Summit Road address. When they knocked on the door, the agents instead discovered that Sharp's parents resided at the Summit Road house and that Sharp did not. They learned that Sharp might be living at 129 Quaker Highway, Apartment 3, Uxbridge, Massachusetts. The agents then drove to the Uxbridge apartment. When they knocked on the door, Sharp's girlfriend, Katherine Renahan, answered and told the agents that Sharp was not home.[3] Renahan called Sharp and then gave the phone to Agent

---

[3] Agents Kabrhel and Cieplik were accompanied by Agents Ott and Luigi when they arrived at the Uxbridge apartment, and they were later joined by more

Kabrhel, who told Sharp that the agents "had some questions for him" that they thought he might be able to answer.[4]

Sharp arrived at the apartment about half an hour later. Agent Kabrhel informed Sharp that he was not under arrest and that "whether or not he talked to [them] was voluntary." R&R at 4-5. Although Sharp later denied that the agents told him that he did not have to talk to them, Sharp agreed to accompany the agents to another room and speak with them. Agents Kabrhel and Cieplik interviewed Sharp for about an hour. Toward the end of the interview, Agent Kabrhel asked for Sharp's consent to search his laptop, email accounts, and Dropbox folder.[5] Agent Kabrhel presented Sharp with a standard FBI "Consent to Search Computer(s)" form, and a standard FBI

---

agents. The agents were dressed casually, and each carried a firearm that was covered by his clothing.

[4] Renahan testified that she "believe[d]" Agent Kabrhel told Sharp over the phone that he "needed to come home," although Agent Kabrhel testified that he merely "requested" that Sharp return to the apartment. She allowed the officers to wait inside for Sharp to return.

[5] The facts are disputed at this point. Sharp claims that he told the agents "more than once" that he did not want to give them his computer, although Agents Kabrhel and Cieplik both testified that Sharp never expressed reluctance to the search.

"Consent to Assume Online Identity Authorization Form." R&R at 7. Agent Kabrhel read the consent forms aloud to Sharp, and Sharp also read the forms for himself. Sharp then signed each form.[6]

On August 31, 2012, the agents delivered Sharp's computer and disks to FBI Special Agent Kevin Orkin in Atlanta. Agent Orkin asked Special Agent Steven Bennett to make a forensic image or copy of Sharp's computer, and Agent Bennett completed the imaging process on September 11, 2012, at 8:45 a.m. That afternoon, at 3:44 p.m., Assistant United States Attorney Brian Pearce was notified that Sharp had revoked his consent to the search and seizure of his property, including his laptop; at 4:24 p.m., Agent Orkin learned about Sharp's revocation of consent.

Sharp moves to suppress any evidence obtained from his online accounts and his laptop computer, claiming that his consent was involuntary and that his revocation of consent made any subsequent search of his property illegal. The magistrate judge found that Sharp's

---

[6] By signing the forms, Sharp expressly acknowledged that he gave his consent voluntarily and without any threats or promises of any kind. Sharp's consent allowed the agents to search his laptop and two disks, and authorized the agents to assume his online identity for his Gmail, Dropbox, and Facebook accounts.

6

consent was voluntary, that Sharp revoked consent only after the relevant evidence was imaged, and that the search warrants for Sharp's Facebook account and laptop were supported by probable cause. Accordingly, the magistrate judge recommends that Sharp's motion to suppress be denied.

Sharp objects to the findings that Sharp's consent was voluntary and that the search of the image of the laptop computer was illegal. The Court will consider each of these objections in turn.

### III.  Analysis

#### A.  Sharp's Consent was Voluntary

The Fourth Amendment protects the rights of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To that end, a search or seizure typically needs to occur under the authority of a court-issued warrant, and warrantless "searches and seizures inside a home . . . are presumptively unreasonable." *United States v. Bervaldi*, 226 F.3d 1256, 1262-63 (11th Cir. 2000) (citing *Payton v. New York*, 445 U.S. 573, 586, 603 (1980)). The Government bears the burden of

establishing by a preponderance of the evidence that an exception to the warrant requirement applies. *Michigan v. Tyler*, 436 U.S. 499, 509 (1978).

"One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Voluntariness of consent is determined by looking at the "totality of the circumstances," including factors such as whether the consenting party could refuse consent, the existence of coercive police procedures, the consenting party's awareness of a right to refuse consent, the consenting party's education and intelligence, and the consenting party's belief that no incriminating evidence would be found. *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002).

Here, Sharp contends that the Government did not meet its burden of establishing that Sharp's consent to the search of his laptop and email accounts was voluntary. Sharp claims that his consent cannot be considered voluntary because he merely "acquiesce[d] to a claim of lawful authority." *See Bumper v. North Carolina*, 391 U.S. 543,

548-49 (1968). Though the record contains contrasting accounts, Sharp contends that the agents told him that if he did not consent they would go get a search warrant. *Id.* However, case law suggests that a claim of lawful authority requires more than just a comment indicating an intention to seek a warrant if consent is withheld. *Id.* at 550. Courts have found that consent is involuntary when the agents falsely claim that they already have a warrant, it is later determined that the warrant is invalid, or the State does not even attempt to rely on the validity of a warrant. *Id.* ("When a law enforcement officer claims authority [that he does not have] to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion . . ."); *United States v. Stabile,* No. 08–145 (SRC), 2009 WL 8641715, at *5 (D. N.J. Jan. 21, 2009) (finding that consent was voluntary and drawing a distinction between a representation that a warrant *will* issue, in which case consent is valid, and a representation that an officer will *seek* a warrant if consent is not given, citing *United States v. Sebetich*, 776 F.2d 412, 424-25 (3rd Cir. 1985)).

9

Sharp also objects to the applicability of several cases cited by the magistrate judge where consent was found to be voluntary despite seemingly coercive circumstances. *See* R&R at 15-17. According to Sharp, those cases are distinguishable because the defendants did not claim to have felt that they had no choice but to consent.[7] However, even if the defendants in these cases did not say they felt that they had no choice but to consent, the facts of these cases still involved far more coercive circumstances than the present case. *See United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (holding consent voluntary where the defendant was "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint[,]" and finding additional issue with the scope of consent because the consent form the defendant signed was blank); *United States v. Barsoum*, No. 8:11-cr-548-T-33MAP, 2012 WL 1405699, at *1, 3 (M.D. Fla. Apr. 5, 2012), adopted by 2012 WL 1405679, at *1

---

[7] Sharp testified that he "felt threatened" by the alleged reference to a search warrant, but he admits that the agents did not make actual threats, and there is no indication that the agents engaged in coercive behavior of any sort. Sharp also said he believed the agents seemed "friendly," and by signing the consent forms, Sharp agreed that his consent was given freely and voluntarily, and not as the result of "threats" of any kind. R&R at 5, 15.

(M.D. Fla. Apr. 23, 2012), *aff'd*, 763 F.3d 1321 (11th Cir. 2014) (finding that defendant "freely consented" to the search of his home where agents pounded on his front door at 6:00 a.m., pulled him out of his house and handcuffed and shackled him, and then conducted an unlawful sweep of his residence with his family inside, all the while with their weapons drawn and under "[c]ircumstances [that] were purposely intimidating").

Particularly instructive is *United States v. Garcia*, 890 F.2d at 361. There, the defendant was arrested and asked to consent, but gave only limited consent. The officers would not accept the limited consent and said if the defendant would not give full consent they would attempt to obtain a warrant. The defendant then gave consent, which the Eleventh Circuit found was voluntary. In so holding, the Eleventh Circuit expressly rejected the argument, now made by Sharp, that the defendant did nothing more than acquiesce to a claim of lawful authority.

Sharp instead cites three cases that he claims are much more similar to the present case. [74], p. 7. The courts in these cases found

involuntary consent, but this Court concludes that the circumstances are distinguishable. In *United States v. Tovar-Rico*, 61 F.3d 1529, 1535-36 (11th Cir. 1995), the court found involuntary consent to a search of the defendant's apartment because it was given only after the defendant "had already observed officers explore every room in the apartment and could not reasonably have known that she could still refuse a search." *See also United States v. Vasquez*, 724 F.3d 15, 20 (1st Cir. 2013) (finding consent involuntary when the agents misrepresented that a search would ensue even without a warrant); *United States v. Hicks*, 539 F.3d 566, 571-72 (7th Cir. 2008) (finding consent involuntary when officer made a "baseless threat[]" that he could get a search warrant, even though he did not personally know if there was probable cause).

    Even if Sharp did feel that he had no choice but to consent, under the totality of the circumstances it is clear that he knowingly and voluntarily consented to the search of his laptop and online accounts, and that his consent was therefore "the product of an essentially free and unconstrained choice." *Garcia*, 890 F.2d at 360. During their time

12

in the apartment, the agents explicitly told Sharp that whether or not he talked to them was "voluntary," and never said that he had to stay. R&R at 13. Sharp never asked to discontinue the conversation, he was never placed on arrest, and the tone of the conversation was friendly and non-confrontational. Agents Kabrhel and Cieplik testified that they had no recollection of Sharp ever expressing any reluctance to consent to the search of his computer, and it is undisputed that Agent Kabrhel separately read each of the consent forms aloud to Sharp while holding the forms in front of him. R&R at 6, 14. Sharp read the forms himself, and signed each form after reading it.

The Court therefore finds that Sharp voluntarily consented to the search of his laptop computer and online accounts, and that the search was not the product of any coercion or illegal conduct.

### B.   The Search of the Image of the Laptop Computer was Legal

Both parties agree that Sharp revoked his consent to search his laptop and email accounts after it was given, but Sharp objects to the R&R's conclusion that a search of the imaged copy of his laptop can be made after he revoked his consent. However, Sharp cites no authority

13

suggesting that a later revocation prohibits the continued review of an item of evidence that was obtained pursuant to a valid consent. Rather, it is well established in the Eleventh Circuit that a "valid consent to a search . . . carries with it the ri[g]ht to examine and []copy." *United States v. Ponder*, 444 F.2d 816, 818 (5th Cir. 1971)[8]; *see also United States v. Ward*, 576 F.2d 243, 244-45 (9th Cir. 1978) ("Because the records were given to the IRS on March 26, 1975, and the demand for return was not made until March 31, 1975, we agree with the district court that any evidence gathered or copies made from the records during the intervening five days should not be suppressed.").

The Court takes notice that this case involves an image of a computer hard drive rather than copies of paper documents. Though there is little authority available on this issue, *United States v. Megahed*, No. 8:07-CV-342-T23MAP, 2009 WL 722481 (M.D. Fla. March 18, 2009), provides some insight. There, agents captured a mirror image of the defendant's desktop computer with the defendant's consent, and

---

[8] Decisions of the Fifth Circuit rendered before October 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

searched the imaged copy after the defendant revoked his consent. The court found that the defendant did not "retain[] a reasonable expectation of privacy of the mirror image copy that the FBI had already obtained" and that the defendant's revocation would not operate retroactively to invalidate the agents' right to copy the hard drive. *Id.* The court in *Megahed* found no difference between a copy of a paper document and an imaged copy of a computer hard drive.

Sharp contends that *Megahed* "got it wrong" because evidence obtained from computers requires analysis, and is therefore somewhat "unknowable." [74], p. 9. Thus, Sharp insists that the Government is not entitled to search an imaged copy of his computer after revocation of consent because they have no idea what is on the computer without additional analysis. Though the Court recognizes that the prior knowledge of the contents of a paper document versus an imaged hard drive may vary, Sharp cites no authority that suggests that the copies of each should be viewed differently for purposes of a later search. Therefore, the Court agrees with the magistrate judge that the reasoning in *Megahed* should control.

The Court also rejects Sharp's contention that *United States v. Ganias*, 755 F.3d 125 (2d Cir. 2014), applies to this case. The court in *Ganias* found that it was unreasonable for investigators to later search an image of the defendant's computer. However, the documents at issue were not covered by the warrant that had issued, yet the government had retained the images for over two years and later attempted to use them as part of a *subsequent* criminal investigation. *Id.* at 137-38. It was the Government's retention of the documents during the interim period, when no probable cause existed to search them, that was held to violate the defendant's Fourth Amendment rights. Here, by contrast, the image of Sharp's laptop was not retained for a long period of time, it was obtained while consent was effective, and there is no indication that it will be used for a separate criminal investigation. The search of the copied image of Sharp's laptop is not unreasonable. Because the copy of Sharp's computer was made prior to his revocation of consent, the evidence obtained from a search of this copy will not be suppressed.

## IV. Conclusion

For the foregoing reasons, Sharp's motion to suppress evidence [54] is denied.

IT IS SO ORDERED this 4th day of August, 2015.

_____
Timothy C. Batten, Sr.
United States District Judge